## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CLINTON COX, Individually and On Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>  v.<br><br>EVOLUS, INC., DAVID MOATAZEDI, RUI AVELAR, and LAUREN SILVERNAIL,<br><br>      Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Clinton Cox ("Plaintiff"), individually and on behalf of all others similarly situated, by and through Plaintiff's undersigned counsel, hereby brings this Class Action Complaint for Violation of Federal Securities Laws ("Complaint") against Evolus, Inc. ("Evolus" or the "Company"); and David Moatazedi, President and Chief Executive Officer ("CEO"), Rui Avelar, Chief Medical Officer ("CMO") and Head of Research and Development, and Lauren Silvernail, Chief Financial Officer ("CFO") and Executive Vice President, collectively referred to as "Individual Defendants," and together with the Company as "Defendants," based upon, *inter alia*, the investigation conducted by and under the supervision of Plaintiff's counsel, which included a review of the Company's public documents, conference calls, and announcements, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company, and readily obtainable information.  Plaintiff's counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Company and Individual Defendants.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Evolus securities between February 1, 2019 and July 6, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violation of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Evolus is a Delaware corporation headquartered in Newport Beach, California.  The Company operates as a medical aesthetics company, and develops, produces, and markets clinical neurotoxins for the treatment of aesthetic concerns.  Evolus' sole product is Jeuveau™, which is a purified botulinum toxin indicated for the temporary improvement in the appearance of moderate to severe frown lines in adults.  As such, Evolus directly competes with Botox®, which is manufactured by Allergan plc and Allergan Inc. ("Allergan") and distributed by Medytox Inc. ("Medytox").  Botox® has been the gold standard of the industry since its approval by the U.S. Food and Drug Administration ("FDA") more than two decades ago.

3.      Beginning in February 2019, Evolus embarked on a public campaign to hype the market right before the commercial launch of its sole leading product Jeuveau™.  To secure an aggressive growth and rapid influx of revenue, Defendants disseminated dozens of public statements in which they promoted Jeuveau™ as a proprietary formulation of the botulinum toxic type A complex, purportedly developed by Korean bioengineering company Daewoong through years of clinical research and millions of dollars' worth of investment in research and development. Among other things, Evolus promised investors that it would attain the number two U.S. market position within twenty-four months of launch.

2

4.      Throughout the Class period, Defendants made materially false and misleading statements, and failed to disclose material adverse facts about the Company's business, operational, and compliance policies.  Specifically, Defendants made false and/or misleading statements and failed to disclose to investors that: (i) the real source of botulinum toxin bacterial strain as well as the manufacturing processes used to develop Jeuveau™ originated with and were misappropriated from Medytox; (ii) sufficient evidentiary support existed for the allegations that Evolus misappropriated certain trade secrets relating to the botulin toxin strain and the manufacturing processes for the development of Jeuveau™; (iii) as a result, Evolus faced a real threat of regulatory and/or court action, prohibiting the import, marketing, and sale of Jeuveau™; which in turn (iv) seriously threatened Evolus' ability to commercialize Jeuveau™ in the U.S. and generate revenue; and (v) any revenues generated from the sale of Jeuveau™ were based on Evolus' unlawful activities, including the misappropriation of trade secrets and secret manufacturing processes belonging to Allergan and Medytox.

5.      The investing public learned the truth about Jeuveau™ on July 6, 2020, when the U.S. International Trade Commission ("ITC") issued its Initial Final Determination in a case brought by Allergan and Medytox against Evolus, alleging that Evolus stole certain trade secrets to develop Jeuveau™.  Coming as a great surprise to unsuspecting investors, the ITC Judge found that Evolus misappropriated the botulinum toxin strain as well as the manufacturing processes that led to its development and manufacture.  Additionally, the ITC Judge recommended a ten-year-long ban on Evolus' ability to import Jeuveau™ into the U.S. and a ten-year-long cease-and-desist order preventing Evolus from selling Jeuveau™ in the U.S.

6.      This news caused a precipitous and immediate decline in the price of Evolus shares, which fell 37% over the course of two trading days, to close at $3.35 per share on July 8, 2020, on

unusually high trading volume.  Following the news of the ITC's Initial Final Determination and the subsequent price drop of Evolus' common shares, several securities analysts downgraded Evolus' rating and significantly lowered the Company's price target.

7.     As a result of Evolus' wrongful acts and omissions, and the precipitous decline in the market value of Evolus' securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

10.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Evolus' common stock trades on the NASDAQ Stock Market ("NASDAQ").  Accordingly, there are presumably hundreds, if not thousands, of investors in Evolus' securities located within the U.S., some of whom undoubtedly reside in this judicial district.

11.     In connection with the acts alleged in this Complaint, Evolus, directly or indirectly, used the instrumentalities of interstate commerce, including interstate wires, U.S. Postal Service mail, wireless spectrum, and the national securities exchange.

## PARTIES

12.     Plaintiff, as set forth in the attached Certification, incorporated by reference herein, acquired Evolus securities during the Class Period, at artificially inflated prices, and was damaged

by the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.    Defendant Evolus is a Delaware company with a principal place of business at 520 Newport Center Drive, Suite 1200, Newport Beach, California 92660, U.S.  Evolus shares trade in an efficient market on the NASDAQ under the ticker symbol "EOLS."  Defendant Evolus operates as a medical aesthetics company, and develops, produces, and markets clinical neurotoxins for the treatment of aesthetic concerns.

14.    Defendant David Moatazedi ("Moatazedi") has served as the Company's President and CEO since May 2018.  Prior to joining Evolus, Moatazedi worked for Allergan for thirteen years in various capacities, including as the Head of Allergan's Medical Aesthetics division. Defendant Moatazedi was the most senior person at Allergan with direct responsibility for Botox® and was privy to all strategic thinking and planning regarding the commercial side of Botox®. Significantly, one of the last things Moatazedi did before leaving Allergan was assess the competitive threat to Botox® posed by Evolus.

15.    Defendant Rui Avelar ("Avelar") has served as the Company's CMO and Head of Research and Development since January 2014.  Prior to joining Evolus, Avelar worked for almost ten years at Allergan as its Chief Medical Officer.

16.    Defendant Lauren Silvernail ("Silvernail") has served as the Company's CFO and Executive Vice President since May 2018.  Prior to joining Evolus, Defendant Silvernail worked for eight years at Allergan as a Vice President of Business Development.

17.    The Individual Defendants possessed the authority to control the contents of statements made by Evolus in the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.

The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their position with the Company at various points, and their access to Evolus' material information that was unavailable to the public, the Individual Defendants knew that the adverse facts described herein were not disclosed to and were being concealed from investors. Defendants are therefore liable for the false statements and omissions alleged herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18.     The botulinum toxin is a toxic substance derived from bacteria called *Clostridium botulinum*. In medical use, small doses of purified botulinum toxin are injected into muscles to block the release of acetylcholine from motor neurons, thereby preventing muscle contraction. The cosmetic form of botulinum toxin is a popular injectable that is widely used for temporarily reducing or eliminating facial fine lines and wrinkles. The botulinum toxin is more commonly known by its brand name, Botox®, which is manufactured by Allergan and distributed by Allergan's partner, Medytox.

19.     Evolus is a medical aesthetic company formed with the sole aim to develop and introduce a cheaper alternative to Botox® to the U.S. market. Since its formation in 2012, the Company singularly focused on the development of its sole product, Jeuveau™ (DWP-450) (prabotulinumtoxinA), which is a purified botulinum toxin type A complex indicated for the temporary improvement in the appearance of moderate to severe frown lines in adults. Evolus readily admits in its regulatory filings that the Company's ability to develop and successfully commercialize Jeuveau™ was, and continues to be, critically important to its continued operations

and financial performance. In fact, the Company's entire existence hinges on its ability to successfully market and sell Jeuveau™ in the U.S.

20.     Once formed, Evolus wasted no time in lining up resources to attain its goal of challenging Botox®'s leading market position. As its first course of action, Evolus entered into an exclusive licensing agreement with Daewoong, which the two companies executed in September 2013. Evolus' interest in partnering with Daewoong was no coincidence. Daewoong served as Allergan's exclusive distributor of Botox® for more than a decade, from 1995 to 2008. Once the Allergan-Daewoong distribution contract terminated, Daewoong was desperate to replace Botox® with a new source of revenue. It was during that time that Daewoong offered a lucrative consulting job to Dr. Byung Kook Lee, for a former Medytox employee who had access to Medytox's proprietary botulinum toxin strain. Thus, Evolus' interest in teaming up with Daewoong was motivated by Daewoong's insider knowledge of Allergan's and Medytox's proprietary trade secrets relating to Botox®.

21.     Next, Evolus based its plan to profit from the sale of Jeuveau™ by capitalizing on Allergan's years of experience in marketing and selling Botox®. Accordingly, Evolus staffed its executive ranks with former high-level Allergan employees with significant Botox® experience, including, among others, Defendant Moatazedi, who until May 2018 was the Head of Allergan's Medical Aesthetic Division directly responsible for Botox® and who was privy to all strategic thinking and planning regarding the commercial side of Botox®. Besides Moatazedi, Evolus' nine-member management team is comprised of five additional former Allergan employees, including: (i) the CFO and Vice President of Business Development, Defendant Silvernail, who joined Evolus in May 2018; (ii) the CMO and Head of R&D, Defendant Avelar, who joined Evolus in January 2014; (iii) the Vice President of Corporate Communications & Public Relations (Crystal

Muilenburg) who joined Evolus in February 2019; (iv) Vice President of Sales (Kurt Knab) who joined Evolus in August 2018; and (v) Chief Marketing Officer (Michael Jafar) who joined Evolus in June 2018.

22.     Equipped with an army of personnel with the knowledge of Allergan's marketing and sales process and a distributor with an insider knowledge of proprietary clinical data and secret manufacturing processes, Evolus was ready to seize the U.S. market.  Accordingly, Evolus embarked on a widespread public campaign during which Evolus positioned Jeuveau™ as an affordable alternative and "the first real competitor to Botox®."  Evolus and the Individual Defendants disseminated dozens of public statements whereby Evolus promoted Jeuveau™ as a proprietary formulation of the botulinum toxin, which was purportedly derived from Daewoong's unique manufacturing processes based on Daewoong's years-long proprietary research and clinical development.

23.     Recognizing the clear threat that Evolus posed to Botox®, Allergan and Medytox levied a series of legal challenges to prevent Jeuveau™'s release.  Of particular weight was a complaint filed on January 30, 2019, against Evolus and Daewoong in the ITC, alleging that Evolus misappropriated certain trade secrets from Medytox, which Evolus used to develop Jeuveau™ ("ITC Action").  Allergan and Medytox alleged that a former Medytox employee, Dr. Byung Kook Lee, provided Daewoong with the results of its research into treatment based on the botulinum toxin.  Unfortunately for unsuspecting investors, evidence and legal arguments presented before the ITC Judge were mostly confidential, depriving the investing public of the ability to make its own determination concerning the veracity of Evolus' promises.

24.     Instead of apprising the investing public of the real weight of evidence presented against it, Evolus assuaged investors' concerns by downplaying the meritoriousness of Allergan's

and Medytox's allegations as "speculative" and "intended to create confusion," while assuring investors of Evolus' confidence in its intellectual property.   These false assurances gave the investing public no reason to suspect that the Company's ability to commercialize Jeuveau™ was seriously threatened by the likelihood of the ITC Judge's ruling against Evolus and in favor of Allergan — a fact known to the Company executives, yet never disclosed to Evolus' investors.

**Materially False and Misleading Statements Issued During the Class Period**

25.    The Class Period begins on February 1, 2019.  On that day, Evolus issued a press release, announcing that the FDA approved Evolus' lead product, Jeuveau™.  In the press release, Defendant Moatazedi highlighted Evolus' achievements and provided projections regarding the commercial launch of Jeuveau™, stating as follows:

> Evolus is the first company in nearly a decade to enter the fast-growing U.S. aesthetic neurotoxin market. What makes Evolus unique is our focus on delivering performance beauty products with a customer-centric approach. *We are pleased to introduce Jeuveau™, the first FDA approved neurotoxin dedicated to aesthetics and manufactured in a state-of-the-art facility using Hi-Pure™ technology.*[1]
>
> \* \* \*
>
> *We are focusing our efforts on ensuring a successful launch of Jeuveau*™ and have initiated the recruitment of a high-quality, specialized U.S. sales force. The launch of Jeuveau™ will be powered by our technology platform designed to eliminate the friction points that exist for customers today. Prior to our U.S. launch, we expect publication of our U.S. Phase III results and to submit for publication our European and Canadian head-to-head Phase III study versus Botox®. I would like to thank all the Evolus employees, clinical investigators, patients and our partner Daewoong for their diligent efforts in bringing a new option to the market."

26.    During the Special Call held on February 4, 2019, Defendant Moatazedi reiterated the Company's plans for rapid commercialization of Jeuveau™, and his confidence in Jeuveau™ becoming "#2 in the U.S. market within 24 months of launch," which Moatazedi planned to

---

[1]     Unless otherwise indicated, all emphases are added and citations are omitted.

achieve by deploying an entirely new "sales force hired and trained prior to our spring launch."
As to Evolus' ability to compete against Botox®, Defendant Moatazedi assured investors that
Evolus had "an experienced management team that recognized the traps for the unwary and knew
the challenges faced by other competitors who fell into those traps."

27.     During the same Special Call, Defendant Avelar highlighted the proprietary nature
of Jeuveau™, giving details regarding the primary and repeat treatment studies which Jeuveau™
underwent on the path to commercial formulation, including data demonstrating Jeuveau™'s
performance compared to Botox®.  Avelar confirmed that Jeuveau™ was Evolus' "proprietary
Jeuveau formulation [ ] manufactured in a brand-new state-of-the-art facility using a Hi-Pure
technology."

28.     Meanwhile, on February 28, 2019, the ITC reached a decision to commence a
formal investigation into a potential violation under section 337 of the Tariff Act of 1930,
prompted by the complaint filed in January 2019 by Allergan and Medytox, alleging
misappropriation of certain trade secrets by Evolus.  The investigation commenced on March 1,
2019.

29.     Approximately two weeks after ITC formally commenced investigation into
Evolus' use of certain trade secrets directly relating to the development of Jeuveau™, Evolus held
an Earnings Call on March 18, 2019, during which Defendant Moatazedi highlighted the FDA's
approval of Jeuveau™, noting that the approval "transitioned Evolus from an R&D-focused
company to a commercial stage organization."   As to Evolus' ability to execute its
commercialization strategy, Moatazedi assured investors that Evolus fully expected a successful
launch, notwithstanding the ITC's investigation:

>     2019 is a pivotal year for Evolus and we expect the launch of Jeuveau to transform
>     the aesthetic market as we know it today. In the coming weeks, Jeuveau will enter

the largest category in aesthetics. ***There has not been a formidable competitor to challenge the market leader until now. Our plans are complete.*** We are well funded and fully prepared to execute on what we believe will be the most exciting launch to engage the aesthetic market.

30.     Despite that Evolus' path to commercialization was less than certain in light of the developing evidentiary record and the ripening legal issues that were developing before the ITC, Defendant Moatazedi continued to pump Evolus' commercialization strategy, stating as follows:

> ***The path to a successful launch of Jeuveau in the spring is clear. The book is written and now it's only a matter of time before the chapters of the story are unveiled. A number of upcoming catalysts will further enable our success.*** In the first half of 2019, we anticipate the publication of our U.S. Phase III trial results and our EU and Canada head-to-head Phase III results versus Botox, both of which are expected to complement our label and to provide clinically relevant information to our customers. We look forward to presenting the commercial launch plan at our Investor and Analyst Day on May 8. ***Our team is poised to enter the U.S. market with a premium brand, high-caliber sales force and an impactful commercial strategy.***

31.     On March 20, 2019, the Company filed its Annual Report on SEC Form 10-K for the quarter and year ended December 31, 2018 ("2018 10-K").  In it, the Company detailed its research and clinical testing program, which purportedly lead to the development of Jeuveau™. As to the "competitive strength" of Jeuveau™, the Company's 2018 10-K stated:

> ***Jeuveau™ will offer the U.S. market the first known 900 kDa neurotoxin alternative to BOTOX.*** The manufacture of both Jeuveau™ and BOTOX starts with a 900 kDa complex, includes adding the excipients human serum albumin, or HSA, and sodium chloride, and finishes by vacuum drying. We believe Jeuveau™ is the only known neurotoxin product in the United States with a 900 kDa neurotoxin complex other than BOTOX. ***We also believe an important component of competitiveness in the neurotoxin market relates to the characteristics associated with the 900 kDa complex and the potential of the accessory proteins to increase the effectiveness of the active toxin portion of the complex.***

32.     As to the risks associated with intellectual property, Evolus' 2018 10-K provided risk disclosures, which merely alerted investors to the possibility that Evolus' and its partners' own intellectual property, trade secrets, and know-how could be stolen, compromised, and misused by

other third parties, but never discussed the possibility that Daewoong and/or Evolus themselves

were in possession of trade secrets misappropriated from others, which they also allegedly misused

for the development of the manufacturing processes associated with Jeuveau™. The relevant

portion of the Company's inadequate and incomplete risk disclosure is as follows:

> We and our current licensor Daewoong currently rely upon a combination of
> trademarks, trade secret protection, confidentiality agreements and proprietary
> know-how . . . . ***Our trade secrets and other confidential proprietary information
> and those of our licensors could be disclosed or competitors could otherwise gain
> access to our trade secrets*** or independently develop substantially equivalent
> information and techniques. Further, the laws of some foreign countries do not
> protect proprietary rights to the same extent or in the same manner as the laws of
> the United States. ***As a result, we or any of our current or future licensors may
> encounter significant problems in protecting and defending our or their
> intellectual property both in the United States and internationally.*** If we or any of
> our current or future licensors are unable to prevent material disclosure of the non-
> patented intellectual property related to Jeuveau™ to third parties, we may not be
> able to establish or maintain a competitive advantage in our market, which could
> adversely affect our business.

33.     Appended to the 2018 10-K, as exhibit 32.1, was a certification pursuant to the

Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Moatazedi and Silvernail certified that

the 2018 10-K "fully complies with the requirements of Section 13(a) or Section 15(d) of the

Securities Exchange Act of 1934 and that the information contained in such report fairly

represents, in all material respects, the financial condition and results of operations of Evolus, Inc."

34.     On April 26, 2019, Evolus announced that the European Medicines Agency's

("EMA") Committee for Medicinal Products for Human Use ("CHMP") issued a positive opinion

on the Nuceiva™ (branded Jeuveau™ in the U.S.) marketing authorization application. The

CHMP is a scientific recommendation for marketing authorization to the European Commission,

which will deliver the final decision on the Company's marketing authorization application. In

the press release, Defendant Moatazedi stated that the CHMP's "***positive opinion further validates***

*the rigor of our TRANSPARENCY clinical development program, which includes the largest*

*aesthetics head-to-head pivotal study versus BOTOX®.*"

35.    On May 1, 2019, the Company filed its Quarterly Report for the quarter ended March 31, 2019 ("1Q19 10-Q").  In it, the Company reiterated the proprietary nature of Jeuveau™ and the successful FDA approval thereof purportedly based on Evolus' extensive clinical development:

> *Jeuveau™ is a proprietary 900 kDa purified botulinum toxin type A formulation indicated for the temporary improvement in the appearance of moderate to severe glabellar lines, also known as "frown lines," in adults.* We believe we will offer physicians and consumers a compelling value proposition with Jeuveau™. Currently, onabotulinumtoxinA (BOTOX) is the neurotoxin market leader, and prior to the approval of Jeuveau™, was the only known 900 kDa botulinum toxin type A complex approved in the United States. We believe aesthetic physicians generally prefer the performance characteristics of the complete 900 kDa neurotoxin complex and are accustomed to injecting this formulation.

36.    Additionally, the Company reaffirmed its plans for the successful commercialization of Jeuveau™ in 2019, stating that it planned on "building our commercialization infrastructure, including marketing, sales and distribution functions, inventory build prior to commercial launch, initiating a product experience program for Jeuveau™ and training and deploying a specialty sales force and implementing a targeted marketing campaign." Appended to the 1Q19 10-Q, as exhibit 32.1, was a SOX certification, wherein Defendants Moatazedi and Silvernail certified that the 1Q19 10-Q "fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 and that the information contained in such report fairly represents, in all material respects, the financial condition and results of operations of Evolus, Inc."

37.    During the Earnings Call held on April 30, 2019, to discuss the Company's financial and operational results, Defendant Moatazedi touted the Company's preparedness to fully execute its strategy for the commercialization of Jeuveau™, stating, in relevant part:

> During the quarter, we also announced the publication of our Phase III U.S. pivotal trial in dermatologic surgery, which further validated the safety and efficacy of Jeuveau versus placebo. We have now fully hired our U.S. sales force. We screened over 6,000 candidates and, following an extensive interview process, we deployed a 140-person sales force. We are pleased with the composition of our sales team. 80% have aesthetic experience. It is clear we have one of the most experienced and, now following our national sales meeting, one of the most energized sales teams in the field. With our singularity and focus, *the sales team is now fully prepared to execute our launch in the coming days*.

> * * *

> We are within days of introducing the first 900-kilodalton neurotoxin in the United States in nearly 30 years. *The path to achieving our goal of the #2 market share position within 24 months of launch is clear.*

38.    On August 12, 2019, approximately a month after the close of fact discovery in the ITC Action, the Company filed its Quarterly Report for the quarter ended June 30, 2019 ("2Q19 10-Q").  In it, the Company reiterated the proprietary nature of Jeuveau™ and its strategic plan to rapidly commercialize Jeuveau™ in the U.S.:

> *Jeuveau® is a proprietary 900 kDa purified botulinum toxin type A formulation indicated for the temporary improvement in the appearance of moderate to severe glabellar lines, also known as "frown lines," in adults.* Our primary market is the self-pay aesthetic market, which includes medical products purchased by physicians that are then sold to consumers or used in procedures for aesthetic indications that are not reimbursed by any third-party payor, such as Medicaid, Medicare or commercial insurance. *We believe we offer physicians and consumers a compelling value proposition with Jeuveau®. Currently, onabotulinumtoxinA (BOTOX) is the neurotoxin market leader, and prior to the approval of Jeuveau®, was the only known 900 kDa botulinum toxin type A complex approved in the United States.* We believe aesthetic physicians generally prefer the performance characteristics of the complete 900 kDa neurotoxin complex and are accustomed to injecting this formulation.

39.    Additionally, Evolus reported generating "net revenues of $2.3 million consisting of sales of Jeuveau®, which was commercially launched and began shipping to customers in the United States in May 2019."

40.    Appended to the 2Q19 10-Q, as exhibit 32.1, was a SOX certification, wherein Defendants Moatazedi and Silvernail certified that the 2Q19 10-Q "fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 and that the information contained in such report fairly represents, in all material respects, the financial condition and results of operations of Evolus, Inc."

41.    During the Earnings Call held on the same day, August 12, 2019, to discuss the Company's financial and operational results, Defendant Moatazedi touted the Company's early success in generating $2.3 million in revenue.  Moatazedi highlighted the Company's marketing efforts, stating, in relevant part:

> We reported $2.3 million of Q2 net revenue, which came from early adopters and accounts that completed the jet program. We expect customer shipments to shift from jet units to revenue generating units as we progress through the third quarter and into Q4. As such you can expect 2019 revenue to be back loaded towards the fourth quarter.

42.    Defendant Silvernail reiterated these figures, stating:

> And during the second quarter we booked net revenue from Jeuveau of $2.3 million. We recognize revenue upon delivery to customers and we deferred no revenue to future periods. For the second quarter ended June 30, gross margin was 71.4%. Please note we expect our gross margin percentage to fluctuate on a quarterly basis as we implement various marketing programs that may affect the average selling price of Jeuveau.

43.    When asked by Wells Fargo analyst, David Maris, to provide an update on the "Korean situation"—meaning the legal proceedings pending against Daewoong and Evolus alleging misappropriation of proprietary technology—Defendant Moatazedi assured investors that he and the Company "*continue to remain confident in [Evolus'] IP*."

44.     In response to a question by Barclays analyst, Balji Prasad, regarding the potential effect of having to turn over manufacturing secrets, Defendant Moatazedi assured investors that "[a]s we said from the beginning, ***we remain very confident in our IP*** an we'll let the court system continue to work through the case."

45.     On November 4, 2019, the Company issued a press release announcing its financial and operational results for the third quarter of 2019.  In the press release, Defendant Moatazedi touted the Company's $13.2 million net revenue as "exceptional," highlighting the "steady increase of new accounts month-over-month."

46.     In the Quarterly Report filed on the same day, for the quarter ended September 30, 2019 ("3Q19 10-Q"), the Company reaffirmed the "proprietary" nature of Jeuveau™ and its strategic plans to achieve strong market position among other botulin manufacturers.  Additionally, the 3Q19 10-Q informed that Evolus "recorded net revenues of $13.2 million and $15.5 million for the three and nine months ended September 30, 2019, respectively."  Appended to the 3Q19 10-Q, as exhibit 32.1, was a SOX certification, wherein Defendants Moatazedi and Silvernail certified that the 3Q19 10-Q "fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 and that the information contained in such report fairly represents, in all material respects, the financial condition and results of operations of Evolus, Inc."

47.     During the Earnings call held on the same day, November 4, 2019, Defendant Moatazedi touted the Company's quarterly net revenue of $13.2 million and its position as number three in the U.S. Neurotoxin industry.  Defendant Moatazedi highlighted Evolus' growing customer base and the Company's ability to convert competitors' accounts into its own, and also gave investors rosy projections regarding future quarters, stating as follows:

> *We do have a lot of confidence in the base of account that placed an order in the third quarter and we feel that base is a sustainable one, moving forward.* As you read in the press release, we talked a bit about the continued increase, a steady increase of new accounts placing orders that we observed throughout the third quarter.

48.    As to Evolus' ability to attain the number two position in the U.S. market within twenty-four months, as originally promised, Defendant Moatazedi stated:

> As it relates to how close we're to number two? Look, we outlined this as a two-year endeavor, and we're now just finishing our first full quarter. We want to make sure that we don't get too far ahead of ourselves, *we feel good that we're on a trajectory to get to that number two position. But we still feel that two-year time frame is the right time for rethinking about this launch.*

49.    Between February 4 and 7, 2020, the ITC conducted a series of evidentiary hearings, which were attended, by among others, Defendant Moatazedi.  During the evidentiary hearings, Medytox presented genetic evidence and expert testimony, establishing that the botulinum toxin strain used by Evolus and Daewoong is remarkably similar to that maintained by Medytox as a trade secret.  Medytox argued that the possibility of the genetic similarity occurring by chance was "infinitesimally small – less than one in the number of starts in the universe."  Additionally, the ITC Court heard testimony and reviewed evidence, which tended to establish that the manufacturing processes for the development of Jeuveau™ was misappropriated by Daewoong from Medytox and not a result of Daewoong's own research and development.  Thus, the evidentiary record before the ITC Court directly undermined Evolus' claims of Jeuveau™'s proprietary nature, Daewoong's claims of proprietary manufacturing process and development, and severely threatened Evolus' ability to successfully commercialize Jeuveau™.

50.    Notwithstanding the overwhelming evidence presented to the ITC Court, Defendants continued to disseminate positive forecasts regarding Jeuveau™'s commercial success.  For example, on February 25, 2020, the Company issued a press release announcing its

financial results for the quarter and year ended December 31, 2019.  In the press release, Defendant

Moatazedi touted the Company's results:

> ***We positioned Evolus for long-term success starting with the first aesthetic only neurotoxin business model in the United States. Our competitive advantage is driven by a singularity of focus on the largest market in aesthetics combined with our proprietary digital platform and a consumer strategy designed for the fast-growing millennial segment.***" [ ] 2019 was a very successful year for Evolus, marked by the rapid uptake of Jeuveau®, which achieved the number three unit share position. ***We believe we are well on our way to achieving the number two unit share position within 24 months of launch.***

51.     On the same day, the Company filed its Annual Report on SEC Form 10-K for the

quarter and year ended December 31, 2019 ("2019 10-K").  In it, the Company reiterated the

proprietary nature of Jeuveau™ by, among other things, detailing the clinical process leading to

the development and FDA approval of Jeuveau™.  Additionally, the Company committed to

continue to aggressively commercialize Jeuveau™ in the U.S. and elsewhere.  To that effect, the

Company provided the following highlights regarding its future strategic plans:

- Partner outside of the United States to reach and serve physicians and consumers in those territories.

- Pursue an aesthetic-only strategy to enhance marketing and pricing flexibility along with improving transparency for our customers.

- Leverage our strong KOL relationships to assist in scientific presentations, publications, and other methods to drive success of our commercial launch of Jeuveau®.

- Leverage our differentiated digital platform to efficiently open new accounts, personalize the purchasing process and efficiently deploy marketing programs at scale.

52.     As to the risks associated with intellectual property, Evolus' 2019 10-K provided

the following inadequate risk disclosures, which merely alerted investors to the possibility that

Evolus and its partner Daewoong's intellectual property, trade secrets, and know-how could be

stolen, compromised, and misused by other third parties, stating, in relevant part, as follows:

We and our current licensor, Daewoong, currently rely upon a combination of trademarks, trade secret protection, confidentiality agreements and proprietary know-how. Botulinum toxin cannot be patented, as it is produced by Clostridium botulinum, a gram-positive, rod-shaped, anaerobic, spore-forming, motile bacterium with the ability to produce the neurotoxin botulinum. ***Only the manufacturing process for botulinum toxin can be patented, for which Daewoong has obtained a U.S. patent. Our trade secrets and other confidential proprietary information and those of our licensors could be disclosed or competitors could otherwise gain access to our trade secrets or independently develop substantially equivalent information and techniques.*** Further, the laws of some foreign countries do not protect proprietary rights to the same extent or in the same manner as the laws of the United States. As a result, we or any of our current or future licensors may encounter significant problems in protecting and defending our or their intellectual property both in the United States and internationally. If we or any of our current or future licensors are unable to prevent material disclosure of the non-patented intellectual property related to Jeuveau® to third parties, we may not be able to establish or maintain a competitive advantage in our market, which could adversely affect our business.

53.    Appended to the 2019 10-K, as exhibit 32.1, was a SOX certification, wherein Defendants Moatazedi and Silvernail certified that the 2019 10-K "fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 and that the information contained in such report fairly represents, in all material respects, the financial condition and results of operations of Evolus, Inc."

54.    During the Earnings Call held on the same day, February 25, 2020, to discuss the Company's financial and operational results during the fourth quarter of 2019, Defendant Moatazedi opened with the following summary:

2019 was a very successful year for Evolus, marked by the rapid uptake of Jeuveau in the US. During the year, we achieved the number three unit share position. We increased our purchasing account base from approximately 350 in the second quarter to 2,000 in the third quarter, and finished the year with over 3,500 purchasing accounts. And lastly, we drove net revenue from $13.2 million in the third quarter to $19.5 million in the fourth.

* * *

In 2019, all key performance indicators trended up and to the right. We established a strong account base, which grew at a steady rate. Reorder rates continued to rise

and we are pleased to report patient satisfaction after day 150 exceeded 75%, based on our J.E.T. survey. In 2020, we transitioned to the second phase of our launch, which is focused on building Jeuveau into a consumer brand . . . .

55.     Defendant Moatazedi then continued to assure investors that Evolus' success will continue in the future:

> **Evolus is well positioned for long-term success.** We have a singularity in focus with one product in a large $1.4 billion aesthetic market. Our investments are hyper targeted on the female millennial segment, which is over-indexing on growth versus the broader market. And our proprietary digital platform enables account personalization at scale.

56.     Importantly, Defendant Moatazedi commented on the impending ITC decision, cautioning investors not to draw any conclusions from any newly unsealed documents, stating as follows:

> Lastly, I'd like to provide an update on the International Trade Commission, or ITC case. As you may know, the ITC hearings took place February 4 through 7 in Washington D.C.
>
> * * *
>
> In June, the judge will reach an initial determination, followed by a final decision by the ITC targeted for October 2020. In the interim, it's customary for various redacted versions of motions, briefs and transcripts to become public. However, I would caution you not to draw any definite conclusions from individual documents, as the initial determination will be decided based on the totality of the merits as assessed by the judge in June and the ITC in October. We look forward to resolving the case before year end and remain confident in the strength of our IP. We can't speak further to this matter on today's call, but recognize it is something important to all of our employees and to our shareholders.

57.     In response to a question from Stifel analyst, Annabel Samimy, regarding the "potential realistic scenarios that could emerge from the ITC case, from the worst case to the best case," Defendant Moatazedi dodged the question, citing to confidentiality, yet assured investors of the propriety of its IP:

> **Clearly, top of mind for investors.** As we mentioned earlier, the hearings took place earlier in February. And with the ITC, the majority of those hearings are

20

confidential, it's not like a public trial where most of the information is available to you. So unfortunately, Annabel, I am not able to provide any more color than what I provided earlier. ***That being said, nothing changed through the case, we feel confident in the strength of our IP and we expect that this case will be resolved before the end of the year and this will be behind us.***

58.     To alleviate any concerns regarding Evolus' future sales and revenue, Defendant Moatazedi provided rosy projections, including that the "next wave of customers, whether you think about our growth coming from going wider from 3,500 customers up, which we expect to do in 2020 or deeper in terms of the utilization per customer will come off of the backs of both the Evolus and the consumer loyalty program."

59.     During the same Earnings Call, Defendant Silvernail touted the Company's fourth quarter revenue and its growth, giving the following highlights:

> During the fourth quarter, net revenue was $19.5 million, which was 48% increase over Q3 219. Q4 net revenue consisted of $18.8 million of Jeuveau products sales in the US and $700,000 of revenue from sales to our Canadian partner. Our full-year net revenue was $34.9 million. As David discussed, we are pleased by the quality of the revenue and the growth trajectory in 019. In the fourth quarter, gross margin increased to 81% compared to 72% in Q3 of 2019. Gross margin in Q4 increased due to one-time launch pricing from our manufacturing partner.

60.     On March 4, 2020, Medytox issued a statement in which it disclosed that a staff attorney at the ITC, who plays a vital role in the decision of the ITC, submitted an opinion backing Medytox's claim that Daewoong and Evolus used Medytox's botulinum toxin strain. Medytox commented that "ITC attorneys' opinions are known to have a profound effect on the final decision of the court." Expectedly, on this news, Evolus' and Daewoong's shares fell 5.7%. Daewoong swiftly moved to refute Medytox's comments, stating in a press release dated March 4, 2020 that Medytox's comments are "***speculative and intended to create confusion*** in the U.S. market" and adding that "it's fairly common for the Judge and the staff attorney to disagree on substantive

matters."  In the same press release, Evolus assured investors that "Evolus and Daewoong *remain confident in the strength of our intellectual property*."

61.    On May 11, 2020, two months before the ITC Court issued its Final Initial Determination, Evolus filed its Quarterly Report for the quarter ended March 31, 2020 ("1Q20 10-Q").  In the 1Q20 10-Q, Evolus still promoted Jeuveau™ as a proprietary formulation with strong potential for market share and growth.  During the Earnings Call held on the same day, Defendant Moatazedi provided an update on the ITC case, forecasting resolution of the case and assuring investors that Evolus "remain[s] confident in the strength of our IP."  Unfortunately for unsuspecting investors, none of the Individual Defendants communicated to the investing public the weight of the evidence presented against Evolus during the preceding months and the threat such evidence posed to Evolus' ability to market and sell Jeuveau™ in the future.

62.    The above statements identified in ¶¶ 25-27, 29-48, and 50-61 were materially false and misleading, and failed to disclose material adverse facts about the Company's business, operational, and compliance policies.  Specifically, Defendants made false and/or misleading statements and failed to disclose to investors that: (i) the real source of botulinum toxin bacterial strain as well as the manufacturing processes used to develop Jeuveau™ originated with and were misappropriated from Medytox; (ii) sufficient evidentiary support existed for the allegations that Evolus misappropriated certain trade secrets relating to the botulin toxin strain and the manufacturing processes for the development of Jeuveau™; (iii) as a result, Evolus faced a real threat of regulatory and/or court action, prohibiting the import, marketing, and sale of Jeuveau™; which in turn (iv) seriously threatened Evolus' ability to commercialize Jeuveau™ in the U.S. and generate revenue; and (v) any revenues generated from the sale of Jeuveau™ were based on

Evolus' unlawful activities, including the misappropriation of trade secrets and secret manufacturing processes belonging to Allergan and Medytox.

### The Truth Begins to Emerge

63.     On July 6, 2020, the ITC Court issued its Final Initial Determination on the question of Evolus' alleged violation of section 337 of the Tariff Act of 1930, in misappropriating certain trade secrets from Medytox.  The ITC Court found that Evolus misappropriated Medytox's trade secrets which caused substantial injury to the domestic industry.  Additionally, the ITC Court found that Daewoong misappropriated certain trade secrets relating to the manufacturing processes of the relevant botulinum toxin strain.  As a remedy, the ITC Court recommended a limited exclusion order preventing Evolus from importing Jeuveau™ into the U.S. for ten years and a cease-and-desist order that would prevent Evolus from marketing and selling Jeuveau™ in the U.S., also for a period of ten years.

64.     On this news, the Company's shares dropped to $3.35 per share over the next two trading days, representing a decline of 37%.

65.     After the close of Class Period, on August 6, 2020, the ITC Court issued a 282-page public version of its Initial Final Determination, which revealed the depth and scope of the evidentiary record developed before the ITC, which only Defendants and not the investing public were previously apprised of.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on Plaintiff's own behalf and as a representative of a class, consisting of all those who purchased or otherwise acquired Evolus securities during the Class Period ("Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

67.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable.   Throughout the Class Period, Evolus shares were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be readily identifiable from information and records in the possession of Defendants or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

68.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class sustained damages from the same wrongful conduct of Defendants.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws described herein.

69.     Plaintiff will fairly and adequately protect and represent the interests of the members of the Class.  Plaintiff is an adequate representative of the Class and has no interest that is adverse to the interests of absent Class members.  Plaintiff has retained counsel competent and experienced in class action litigation, including class actions in the financial services industry.

70.     Common questions of law and fact exist as to all members of the Class, which predominate over questions affecting solely individual members of the Class.  These common questions of law include, without limitation:

- whether statements made by Defendants to investors during the Class Period included misrepresentations of material facts about the business and operations at Evolus;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements or omitting material information that would correct the misstatements;

- whether Defendants' acts as alleged herein constituted violations of the federal securities laws;

- whether the prices of Evolus securities during the Class Period were impacted by Defendants' conduct described herein;

- injury suffered by Plaintiff and Class members; and

- the appropriate measure of damages suffered by Plaintiff and Class members.

71.    A class action is superior to other methods for the fair and efficient adjudication of the controversy because joinder of all Class members is impracticable.  Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

72.    Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

73.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE FRAUD ON THE MARKET DOCTRINE

74.    The market for Evolus securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to

disclose, Evolus' securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Evolus shares and market information relating to Evolus, and have been damaged thereby.

75.    During the Class Period, the artificial inflation of Evolus' securities was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Evolus' business and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Evolus' finances and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Evolus securities. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Evolus securities at such artificially inflated prices, and each of them has been damaged as a result.

76.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine as:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- These misrepresentations and omissions were material to Plaintiff and the Class;

- Evolus shares were traded on the NASDAQ and were covered by numerous analysts;

- Evolus shares were liquid and traded with significant volume during the Class Period;

- the misrepresentations and omissions alleged herein would likely induce a reasonable investor to misjudge the value of the Evolus securities; and

- Plaintiff and Class members purchased and/or sold Evolus securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

77.    As a result of the foregoing, the market for Evolus securities promptly digested current information regarding Evolus from all publicly available sources and reflected such information in Evolus' share price.  Under these circumstances, all purchasers of Evolus' securities during the Class Period suffered similar injury through their purchase of Evolus' securities at artificially inflated prices.  Thus, a presumption of reliance applies.

78.    Accordingly, Plaintiff and Class members are entitled to a presumption of reliance upon the integrity of the market.

79.    In the alternative, Plaintiff and Class members are entitled to a presumption of reliance established by the U.S. Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), because Defendants omitted material information during the Class Period violating a duty to disclose such information as described above.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business and operations—information that Defendants were obligated to disclose — positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## **LOSS CAUSATION**

80.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

81.    During the Class Period, Plaintiff and the Class purchased Evolus' securities at artificially inflated prices and were damaged thereby.  The price of Evolus securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## NO SAFE HARBOR

82.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements and omissions pled in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances.  To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false and misleading when made.

## SCIENTER ALLEGATIONS

83.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Evolus, their control over, and/or receipt and/or modification of Evolus' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Evolus, participated in the fraudulent scheme alleged herein.

84.    Additionally, the Individual Defendants, by virtue of their employment as members of high-level management at Allergan and also Evolus knew that the public documents and statements issued or disseminated were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

85.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

86.    The Individual Defendants, because of their positions with Evolus, made and/or controlled the contents of the Company's public statements during the Class Period.  Each Defendant was provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-

public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were materially false and misleading.  As a result, each of these Defendants is responsible for the accuracy of Evolus' corporate statements and are therefore responsible and liable for the representations contained therein.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

87.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

88.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved false statements which they knew or deliberately disregarded in that they contained misrepresentations and failed to disclose material facts to make the statements made not misleading.

89.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by: (a) making false statements of material facts or omitting to state material facts needed to make the statements not misleading; or (b) engaging in acts and practices that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Evolus securities during the Class Period.

90.    Defendants acted with scienter because they knew that the statements issued in the name of Evolus were materially false and misleading; knew that these statements would be disseminated to investors; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of these statements as primary violations of securities laws.  Defendants, through receipt of information reflecting true facts about Evolus, their control over, and/or receipt

of or modification to Evolus' allegedly materially misleading statements, which made them aware of Evolus' confidential proprietary information, participated in the fraudulent scheme complained of herein.

91.     Defendants had actual knowledge of material omissions and/or the falseness of material statements set forth by Evolus, and intended to deceive Plaintiff and Class members, or at a minimum, recklessly disregarded the truth through their failure to ascertain and disclose the truth in statements made by them or other Evolus employees to investors, including Plaintiff and Class members.

92.     Pursuant to the foregoing, the price of Evolus securities were artificially inflated during the Class Period.  Because of their lack of knowledge of the false nature of statements made by Defendants, Plaintiff and Class members relied on the statements made by Defendants and/or the integrity of the market price of Evolus securities during the Class Period in purchasing Evolus securities at prices that were artificially inflated because of the false and misleading statements made by Defendants.

93.     Were Plaintiff and Class members made aware that the market price of Evolus securities were artificially and falsely inflated by misleading statements made by Defendants, and by material adverse information that Defendants failed to disclose, they would not have purchased Evolus shares at artificially inflated prices, or purchased them at any price.

94.     Based on the wrongful conducted alleged herein, Plaintiff and Class members have suffered damages in an amount to be determined at trial.

95.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and Class members for significant damages suffered via their purchases of Evolus securities during the Class Period.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

96.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

97.     During the Class Period, the Individual Defendants were involved in the management and operation of Evolus' business affairs.  Because of their senior positions, they had knowledge of adverse non-public information regarding Evolus' distribution of Jeuveau™ and the fact that the product was created out of stolen trade secrets and the false representations in connection therewith.

98.     As highly positioned officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information regarding Evolus' licensing agreement for Jeuveau™, the Company's financial condition and results of operations, and to correct any public statements issued by Evolus which were materially false or misleading.

99.     Because of their position of authority at Evolus, the Individual Defendants controlled the contents of various public filings, press releases and reports that Evolus disseminated in the market during the Class Period.  During the Class Period, the Individual Defendants utilized their authority to cause Evolus to execute the wrongful acts alleged herein. The Individual Defendants were each therefore a "controlling person" at Evolus pursuant to Section 20(a) of the Exchange Act.  On this basis, they were a participant in the unlawful conduct alleged that caused the prices of Evolus securities to be artificially inflated.

100.    Based on the conduct described above, the Individual Defendants are liable for the violations committed by Evolus pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands relief as follows:

A.    Certifying this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as Class Representative;

B.    Awarding damages in favor of Plaintiff and members of the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

C.    Awarding Plaintiff and members of the Class their costs of suit, including reasonable attorneys' fees and expenses, and including expert fees, as provided by law;

D.    Awarding Plaintiff and members of the Class pre- and post-judgment interest at the maximum rate allowable by law; and

E.    Directing such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated:  October 28, 2020                          Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Attorneys for Plaintiff*

Tuesday, October 20, 2020

# Evolus (EOLS)

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1. I make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Evolus, Inc. ("Evolus" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3. I did not purchase or acquire Evolus securities at the direction of plaintiffs counsel, or in order to participate in any private action arising under the Securities Act or Exchange Act.

4. I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Evolus securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my transactions in Evolus securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7. I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8. I declare under penalty of perjury that the foregoing is true and correct.


**Name**

**Print Name**
Clinton Cox

**Signature**



**Acquisitions**

## Configurable list (if none enter none)

| Date Acquired | Number of Shares Acquired | Price per Share Acquired |
|---|---|---|
| 1/23/2020 | 110 | 10.19 |



(redacted)

**Evolus, Inc. (EOLS)**                                                                    **Cox, Clinton**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 1/23/2020 | 110 | $10.1900 |